IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

<u>Sylvester Shockley</u>      }
     Petitioner       }
                     }
     v.                }     Civ. Act. No. 06-211-SLR
                     }
<u>**Thomas Carroll, Warden**</u>   }
<u>**Carl Danberg, Attorney General**</u>  }
<u>**For The State of Delaware**</u>   }
     **Respondents**     }



FILED

OCT 1 0 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Scanned

## PETITONER'S TRAVERSE TO RESPONDENTS ANSWER/EVIDENTIARY HEARING REQUESTED

### I.    <u>CUSTODY</u>

Petitioner, Sylvester Shockley (hereafter Shockley) agrees that he is in custody as stated in the Answer. Shockley claims that he is not "lawfully" in custody because of the violations of his rights under the United States Constitution that are alleged in the Petition for Writ of Habeas Corpus and herein. Except as expressly admitted herein, Shockley denies each and every allegation of the Answer and re-affirms that his confinement is in violation of the Constitution.

### II.    <u>STANDARD OF REVIEW</u>

Simply put, this Federal Court is required by Federal Law to accept as true any Factual allegations that are made and supported in Federal Court, since the State Court has made findings against Shockley on those facts without first ordering a hearing, thus the State's fact-finding procedure is "unreasonable", which means that the State's factual findings are not binding on Federal habeas corpus. See, <u>**Taylor v. Maddox, 366 F.3d 992, 1001 (9thy Cir. 2004)**</u>. Shockley's factual allegations made in his State pleadings are clearly stated and are supported by evidence contained in the exhibits that he presented to the State Court in support of his pleadings.

In addition, Shockley completed the process of exhaustion in State Court by presenting his factual allegations to the State's highest court, and hereby requests an evidentiary hearing in Federal Court. Respondents omit entirely from it's discussion what may be the most important standard of review to be considered at this juncture in the litigation – the standard this Court must apply in deciding whether or not to grant Shockley an evidentiary hearing on one or more of the habeas corpus claims. A petitioner on federal habeas corpus is entitled to an evidentiary hearing where, as here, the petitioner establishes a "colorable" claim for relief, and where, as here, the petitioner has never been accorded a state or federal hearing on his claim. See **Earp v. Oronski, 431 F.3d 1158, 1167 (9th Cir. 2005)**, citing **Townsend v. Sain, 372 U.S. 293 (1963)** and **Keeney v. Tamayo-Reyes, 504 U.S. 1, 5 (1992)**. In stating a "colorable" claim, a petitioner is merely required, as here, to allege specific facts, which, if true, would entitle him to relief. A federal court is not required to order a hearing where the petitioner failed to develop the facts in state court. In such cases, the federal court accords a presumption of correctness to the facts found by the state court, and need not hold any evidentiary hearing unless those facts are rebutted by clear and convincing evidence. On the other hand, no deference is due where the state has, as here, an "unreasonable" determination of the facts; and where a state court makes evidentiary findings without holding a hearing and giving Shockley an opportunity to present evidence, such findings clearly result in an "unreasonable" determination of the facts. See **Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004)**.

In sum, an evidentiary hearing is required and an appellate court will remand for a hearing if the district court rules without granting one – "where the petitioner establishes a colorable claim for relief and has never been accorded a state or federal hearing on his claim." **Earp, supra, at 1167**.

Here Shockley requested an evidentiary hearing at every level of the state court proceedings and each of the courts to which he applied ruled without granting him an evidentiary hearing. **ID** at Respondents Answer unnumbered page 4. As a result, (1) Shockley is entitled to an evidentiary hearing in this Court before the Court can make any

2

credibility determinations on the facts alleged in the petition and supporting exhibits; and (2) any controverted "facts" found by the State Court while denying a request for an evidentiary hearing necessarily result from an "unreasonable determination" of the facts, and hence are not entitled to any presumption of correctness. See **Earp, supra, at 1167; Taylor, supra, at 1101** ["where, as here, the State Court's legal error infects the fact finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it."]. As set forth in the State Court proceeding and Respondent's Answer, Respondents stated that the November 2004 decision in **Evans** was withdrawn by an Opinion issued on April 11, 2005, and that under **Evans**, Shockley's "good time credits only applied to his natural life sentence for the purposes of accelerating [his] natural life sentence for purposes of accelerating [his] parole eligibility date. And that [Shockley] is not eligible for conditional release and must remain incarcerated until his death, unless he is granted parole." **Evans, 872 A.2d at 558** (footnotes omitted). See Respondents Motion to Affirm dated July 15, 2005, Exhibit A and the State Supreme Court August 24, 2005 Order (Exhibit B) which affirmed the judgment of the Superior Court on the basis of **Evans v. State, 872 A.2d 539 (Del. 2005)**, without remanding the case for an evidentiary hearing and giving Shockley an opportunity to present clear and convincing evidence. In addition, the Superior Court's decision, Exhibit C, dated May 6, 2005, which summarily dismissed Shockley's petition constitutes an "unreasonable determination" of the facts. As a matter of record, Respondent's Answer somehow alleges that the General Assembly clearly _**intended**_ the reference to 45-years enunciated in **11 Del. Code Ann., Section 4346(c)** to apply only to parole eligibility. But the fact is as a matter of law and fact, it's not what the General Assembly _**intended**_ the statute to mean; its what the statutes clearly and unambiguously states in its plain language. At this point, Shockley incorporates the arguments made by him in his petition for writ of habeas corpus and directs this Court's attention in stating a "colorable claim" to the specific facts alleged in the "Background and Analysis" section of his petition, **id** pages 2-9, which if true, would entitle him to relief. In addition, contrary to arguments and allegations made by Respondent's in their Answer, **id** passim, Shockley reasserts the conclusion that, despite the Court's Opinion in **Evans v. State, 872 A.2d 539 (Del. 2005)**, which declared **House Bill 31** _**unconstitutional and**_

*inoperative in its entirety*, there was no basis to withdraw it's prior decision in **Evans v. Kent County,** Del. 2004, Del. Lexis 545 (Del. en banc, Nov. 23, 2004).

III.    **SHOCKLEY'S POSITION**

1.    As a matter of record, Shockley asserts that there was no basis or jurisdiction for the Court's Order of February 3, 2005 to allow the State to reargue the November 2004 decision issued in the **Evans** case. According to Court Rules, the Mandate with record should have returned to the Superior Court within fifteen days of the Court's Order denying the State's Motion for Re-argument. Moreover, the clear facts show that the State had been granted numerous opportunities to argue and re-argue this mater. A fact conceded by Respondent's in their "Answer"; **Id** at unnumbered pages 1-4. In addition, four pages of the State's second answering brief in the **Evans** case concerned **Jackson v. State, 700 A.2d 1203 (Del. 1997).** **Jackson** was also included in the State's Motion for Re-Argument. Both times the Delaware Supreme Court rejected the **Jackson** argument, en banc. As such, there was no legal basis for the Court to grant the State's subsequent motion for reconsideration or it's January 28, 2005 Motion to Recall the Mandate asking for the **Evans** decision directive to be recalled and the case reconsidered. Shockley does not know of any Supreme Court Rule that allows the State to argue a case over and over with no apparent end. Shockley alleged that his good time and merit credits have been ended or forfeited in violation of his procedural due process and equal protection rights in violation of the 5th and 14th Amendments to the United States Constitution.

2.    The Court's February 3, 2005 Order questioned if the **Evans** appeal should be controlled by **Jackson v. State, 700 A.2d 1203 (Del. 1997)** or **Crosby v. State, 824 A.2d 894 (Del. 2003).** The focus in **Jackson** was inmates serving a parolable life sentence. The issue was, could those inmates earn merit good time? The Court held that they could not. However, it is clear by statute that a prisoner serving a fixed term of 45 years can earn good time and merit good time unless he or she is sentenced under **Section 4214(a)** that limits earning time off to merit good time.

The question thus has been answered quite clearly by the Supreme Court in two separate en banc decisions. Shockley, by statute, is serving a fixed term of 45 years. The statute was made law in 1964. In **Crosby** and **Evans**, the Court held en banc that persons sentenced under **Section 4346(c)** were to serve a fixed term of 45 years. Since Shockley is not serving a life sentence, **Jackson** (despite Respondents contentions/Answer) should have no effect in this case. The Court's decision should have been controlled by it's holding that a life sentence was to be considered a fixed term of 45 years under **Section 4346(c)** and subject to conditional release pursuant to **Section 4348**.

**Jackson** attempted to use **Section 4346(c)** as a number only to calculate a parole eligibility date and a conditional release date. **Jackson** failed to argue **Section 4346(c)** required the Department of Corrections to consider his sentence as a fixed term of forty-five years.

In **Crosby**, the Superior Court held **Section 4346(c)** required the Department of Corrections to consider **Crosby's** sentence as a fixed term of 45 years with a right to earn merit good time off of the 45-year maximum sentence. The Supreme Court agreed en banc.

Thus, the **Evans** Court, en banc, once again held that **Evans** was in fact serving a fixed term of 45 years and could receive good time and merit good time off of his max-out date, and be released on conditional release.

4. There are clear differences in **Jackson** and **Crosby** and **Evans**. Under **Section 4346(c)** and **4348**, Shockley is serving a fixed term of forty-five years and is therefore entitled to good time merit time off and conditional release. In **Jackson**, the Court referred to **Section 4348** as applying to inmates serving a fixed term of imprisonment. Shockley is in fact and law serving a fixed term of 45-years. The question does not concern **75 Del. Laws c.1** (referred to as **"House Bill 31"**) or **Jackson v. Multi-Purpose Criminal Justice Facility, 700 A.2d 1203 (Del. 1997)**, contrary to Respondent's Answer. The only question concerns **Sections 4346** and **4348** - - if a prisoner serving a

life sentence under **Section 4346(c)** was to serve a fixed term of 45 years. The record overwhelmingly demonstrates by clear and convincing proof that "The General Assembly, by amending the Delaware Code impliedly recognized that before the Truth-In-Sentencing Act of 1989, effectuated June 30, 1990, a life sentence was not for a person's natural life, but rather for a 45-year term." As the Court in **Crosby v. State, 824 A.2d at 900** recognized, by eliminating such good time credits, the General Assembly intended that a life sentence imposed for Class A felonies would no longer be considered a term of 45-years, but rather would be a natural life sentence.

See also, **Section 4346(a)**, "eligibility for parole", which Shockley addressed in the State Court. Simply put, it is clear that **Section 4346(c)** refers to a fixed term of years that can be reduced by merit and good behavior credits, not in conflict, but in support of **Section 4346(a)**. The 1964 General Assembly included **Section 4346(c)** to give defendants a fixed term of 45 years, accord Shockley. It would not be possible to serve one third of a life sentence nor could a life sentence be reduced by merit and good behavior credits. In fact, again the State Supreme Court held the 1964 General Assembly clearly intended those defendants sentenced under **Section 4346(c)** to serve a fixed term of 45 years. The General Assembly's intent of **Sections 4346** and **4348** is consistent with interpretations of the Delaware Supreme Court and numerous other state and federal courts and departments. **Smith v. State, 317 A.2d 20 (1974)**, Exhibit D; **Brown v. Redman, Mem. Opin. Civil Action No. 89-574 – Joseph J. Farnan, Jr.,** Exhibit E; Letter from Public Defender of the State of Delaware dated September 16, 1985, Exhibit F; Letter from Superior Court of the State of Delaware dated August 31, 1994, Exhibit G; and see **Watson v. Burgan, 610 A.2d 1364, July 2, 1992** (holding that **Sections 4346** and **4348** must be read in pari materia); **Du Pont v. Mills, (Citations omitted) (same)**.

5.    Shockley's status sheet gave him a parole eligibility date minus good time. Had his eligibility date been one third of forty-five years with no good time, his parole eligibility date would have been after fifteen years. Shockley was indicted by the Grand Jury in September of 1981 and sentenced in March 1982. In 1991, 1994, 1996, 2000, 2003 and 2006, the Board of Parole denied Shockley parole. The record shows that good

time was removed from the 45 years and that his initial appearance before the Board of Parole was 10 years after the date he was indicted in 1991.

Now, after calculating good time off a 45 year sentence as required by law, **11 Del. C. Section 4382**, the amount of good time off 45 years is 13-1/2 years. That would give the prisoner a max out date after 31 and a half years. This suggests Shockley's initial parole date should have been after serving 10 years. It appears the amount of good time taken off his 45 year sentence was actually the amount of time he was to be eligible for parole, 10 years in 1991. Pursuant to **11 Del. C. 4346(c)**, "For all purposes of this section, a person sentenced to imprisonment for life shall be considered as having been sentenced to a fixed term of 45 years." Either the Department of Corrections should consider his sentence as a fixed term of 45 years or not; **Section 4346(c)** states that it should.

6.    For years, prosecutors, defense attorneys and judges all understood that a parolable life sentence could be reduced.    This was also the generally accepted understanding of the Delaware Bench and Bar.  In fact, not only has the Department of Corrections understood that a parolable life sentence is eligible for conditional release, but the consistent decisions of judges, defense attorneys, Exhibits E, F, and G, supra, and prosecutors, i.e., the plea considerations of defense attorneys and the sentencing decisions of Superior Court and U.S. District Court of Delaware judges likewise reflect the understanding that a life sentence was the equivalent of a fixed term of 45 years and that a pre-TIS parolable life sentence could be reduced by good time credits and conditional release. The Delaware Supreme Court as well as far back as the 1964 General Assembly, clearly knew in order for the Department of Corrections to comply with the law, **11 Del. C. 4346(a)** <u>all</u> inmates would have to be serving a fixed term of imprisonment. "Shall" is a mandatory word as it is used in **Section 4346(c)**. The Department of Corrections should have considered Shockley as having been sentenced to a fixed term of 45 years and had his status sheet reflect that he had a max out date less good time and less merit behavior credit as well.

IV.    **SHOCKLEY'S LIFE SENTENCE IS A FIXED TERM OF 45 YEARS UNDER DELAWARE LAW. CROSBY OVERRULED JACKSON.**

7.    The last sentence of the Delaware Supreme Court's 2003 en banc opinion in **Crosby v. State, 824 A.2d 894 (Del. 2003)** read as follows:

> **"The Clerk of the Court is also directed to transmit a copy of this Opinion to the Attorney General, Public Defender and Department of Correction so that any inmate serving a life sentence that is affected by this Opinion can have it calculated on the basis of a fixed term of 45 years with appropriate good time credit."** **Crosby at 914.**

This statement was more than just a reference to inmates serving **Section 4214(a)** life sentences. The words "any inmate serving a life sentence" clearly include <u>all</u> life sentences.

In the Appendix to the **Crosby Opinion**, the Court identified numerous cases with **Section 4214(a)** sentences, none of which were life sentences. The absence of any **4214(a)** life sentences, other than **Crosby's** makes clear the Court's reference to "any inmate serving a life sentence" intended to include pre-TIS life sentences for Class A felonies.

The last sentence in **Crosby** was a reference to all inmates actually "affected" by the Court's Opinion. Included are **Evans**, Shockley's and all others who were sentenced to life with the possibility of parole; and including all inmates serving life sentences for Class A felonies who earned good time credits that reduces the length of the sentences they must serve; **11 Del. C. 4381(a)** before the enactment in 1989 of the Truth-In-Sentencing Act (TIS), **67 Del. Laws C. 130**. The statement, and the directive to the Court Clerk made in the last sentence of the **Crosby Opinion** <u>**provides a remedy**</u>. Shockley's procedural due process and equal protection rights have been violated in violation of the **5th** and **14th Amendments to the United States Constitution**. The directive was a grant of relief to those inmates negatively affected by the Court's prior

precedent, **Jackson v. Multi-Purpose Criminal Justice Facility**, which was being overruled.  Indeed this is so because in 2003, the Supreme Court en banc decided **Crosby**.  The en banc panel, which decided Crosby, included two of the three panel members who decided **Jackson**, former Chief Justice Veasey and former Justice Walsh, the author of the Court's Opinion in **Jackson**.  In **Crosby** the Court held, reading **Section 4346(c)** and **4348** in pari materia, **"Section 4348** incorporates **Section 4346(c)**'s definition of a life sentence as a fixed term of 45 years.  To the extent that Jackson is inconsistent with this Opinion, it is overruled." See **Crosby, 824 A.2d at 894** (*emphasis supplied*).

8.    A judicial decision is overruled "when a later decision, rendered by the same Court...expresses a judgment upon the same question of law directly opposite to that which was before given, thereby depriving the earlier opinion of all authority as a precedent."  See **Black's Law Dictionary 1105 (6ᵗʰ Ed. 1990)**.  This is exactly what **Crosby** did; it expressed a judgment on the contending issue in this appeal; i.e., whether Delaware's conditional release statute, **11 Del. C. Section 4348** incorporates the parole statute's definition of a life term as a fixed term of 45 years; **11 Del. C. Section 4346(c)**.  The decision in **Crosby** is directly opposite to the decision in **Jackson**.  There is no language in **Crosby** suggesting that **Jackson** was overruled solely to the extent necessary to reconcile **Jackson** with life sentences imposed pursuant to **Section 4214(a)** or as Respondents erroneously contend in their Answer, "That the **House Bill 31** legislation would have done no more than return the State of the law to what it was in 1997 after the **Jackson** decision."  Such an interpretation is specious, and the same speciousness holds true for Respondent's Judge-Made-Law 2005 decision in **Evans**.  Because the Delaware Supreme Court stated on November 23, 2004 in it's original decision in **Evans**, "There is no principled way to read **Crosby**" as limited to **Section 4214(a)** life sentences.  See **Evans v. State, No. 67, 2004 WL2743546 (Del. Nov. 23, 2004) at page 3**.  Nothing has changed since November 2004 to provide a principled way to limit **Crosby** to **Section 4214(a)** life sentences.  However, when the Court in **Evans v. State, 872 A.2d 539 (Del. 2005)** concluded that **House Bill No. 31** violated the State Constitution (**872 A.2d at 543-53**) and that the rule articulated in **Jackson** applied to inmates serving parolable life

9

sentences imposed before the enactment of TIS, withdrawing the November 2004 decision, abandoning the rule of law or principle underlying the Court's opinion or final judgment in the **Evans** case, the Court essentially ignored the legislative history and logical reasoning upon which the **Crosby** opinion is based. Consequently, the first argument raised by Respondent's in their Answer that "the State Supreme Court's interpretation of **Sections 4346** and **4348** decided in **Evans v. State, 872 A.2d 539 (Del. 2005)** that for inmates such as Shockley, the reference in **Section 4346(c)** to a 45 year term operated only as a means to fix the inmates parole eligibility date; and did not translate into an entitlement to conditional release under **Section 4348**; and that, that reading of State law is somehow binding on this Court in this proceeding is without merit." Equally misleading in Respondent's Answer is their total misrepresentation of Shockley's argument regarding violations of his rights under the Ex Post Facto Clause of the United States Constitution." Simply put, Shockley does not claim that there was a retroactive legislative repeal of the good time credit statute or parole statute by **House Bill No. 31**, which was declared unconstitutional by the State Supreme Court. Shockley offers additional evidence, Exhibit H, Letter from State Supreme Court Chief Justice Myron T. Steele to Governor Ruth Ann Minner dated April 11, 2005, which declared **House Bill No. 31** entirely unconstitutional in support of this claim. As such, Respondent's assertion is incorrect because they have either misapplied, misrepresented or overlooked several tenets of statutory interpretation; starting with the weight which must be accorded to changes occasioned by the passage of the Truth-In-Sentencing Act of 1989 (TIS). Preceding the June 30, 1990 enactment of TIS was **House Bill No. 417**. Viewed in this light, the **Evans 2005** decision thus evidences a misapplication of settled law regarding statutory construction that rests on a manifest error of law.

9.    Furthermore, in reaching its judgment in **Crosby**, the en banc Court looked beyond the mere wording of **Sections 4346(c)** and **4348**. The Court reviewed the history underlying the other sentencing provisions in the criminal code. **Crosby** held that the General Assembly's enactment of **Section 4381(a)** as part of TIS, which eliminated good time credits, and thus eliminated conditional release for life sentences for Class A felonies, was a reflection of "the General Assembly's understanding...that prior to Truth-

In-Sentencing Act, a life sentence for Class A felonies was considered to be a term of 45 years under **Section 4346(c)** and subject to conditional release pursuant to **Section 4348**." See **Crosby, 824 A.2d at 900**. If, before TIS, a life sentence meant natural life, the enactment of **Section 4381(a)** would have been unnecessary. **Crosby** held that the legislative **intent** in enacting **Section 4381(a)** was to *change* the existing law. That is, to make it so a life sentence for Class A felonies would no longer be considered a term of 45 years but would, in fact, be a natural life sentence", **Id**. It is also important to note here that, prior to TIS, the Class A felonies were First and Second Degree Murder, First Degree Rape (subsequently amended to First Degree Unlawful Sexual Intercourse), First Degree Kidnapping, and Attempted Murder. The original slip opinion in the case correctly recognized that "[a]lthough the Defendant in **Crosby** was sentenced under the Habitual Criminal Statute, our holding with respect to **Sections 4346(a)** and **4348** did not in *any* way turn on that fact." The original opinion also correctly characterized **Jackson** as "expressly overruled" by **Crosby**; **Id at page 3**. **Jackson** therefore, despite **Evans 2005** is of no precedential value and cannot be applied to Shockley retroactively; **Evans v. State, 872 A.2d 539 (Del. 2005)(Same)**. This is so because:

## V.   THE STATE SUPREME COURT'S PREVIOUS EN BANC DECISION WAS FINAL

10.   On November 23, 2004 the Court issued its slip opinion. On December 8th, the State moved to reargue the en banc opinion. On January 14, 2005 the Court denied the State's Motion for Re-argument. When a motion for re-argument is denied, a "mandate, certified copy or other appropriate process, with a certified copy of the opinion or order…shall be issued to the trial court", **Supreme Court Rule 19(a)**. "After reciting the proceedings in the trial court and in the Supreme Court, the mandate shall direct the affirmance, reversal or modification of the judgment or order in the trial court… and shall direct such court to take proceedings in conformity with the opinion of the Supreme Court." Copes of the mandate must be forwarded to counsel or to parties appearing pro se. In the **Evans** case, the Clerk issued the mandate on Friday, January 21, 2005, one week after the motion for re-argument was denied. It complied with the previous

referenced rules as well as the Court's directive in **Crosby, 824 A.2d at 914**. It was received by Counsel for the State who moved to recall the mandate on Friday, January 28, 2005. The Superior Court also received the mandate with certified copies of the Supreme Court Opinion and denial of re-argument orders attached. Apparently however, when the mandate was issued, somehow the Superior Court's trial record, which had been forwarded to the Court after the appeal commenced, allegedly temporarily could not be located and was not returned to the Prothonotary with the mandate as required under **Rule 9(d)**. When the Court became aware of the alleged omission about one week later, the Court determined that the mandate had not issued. Shortly thereafter, the Court also issued an Order finding that the mandate had not properly issued as a result of this omission, and that, as a result, the State's Motion to Recall the Mandate was "moot". Moreover, the Court somehow also treated the State's Motion to Recall the Mandate as a Motion for Reconsideration of the denial of the State's earlier Motion for Re-Argument. **Evans v. State, Del. Supr., No. 67, 2004, Jacobs, J. (Feb. 3, 2005)**.

11.    The Court should not have reconsidered its' original denial of the States motion for re-argument on the ground that the mandate did not properly issue after re-argument was denied.    Treating the State's Motion to Recall the Mandate as a Motion to Reconsider the Court's original denial of the State's Motion for Re-Argument effectively permitted the State as a party to present successive motions for re-argument.    This contravened the Court's rule that an order denying a motion for re-argument, like the one the Court issued on January 14th, is not subject to further motion(s) for re-argument; **Supreme Court Rule 8**. It essentially permitted what the rule forbids---successive bites at re-argument.    The Court's denial of re-argument issued on January 14th, after the parties had ample opportunity to argue and re-argue their case, should therefore stand as final under the Court's rule. See **Calderon v. Thompson, 523 U.S. 538, 118 S.Ct. 1489 (1998)**.

12.    In addition, the mandate itself is a clerical paper which serves to return what is most important to the Court and parties below --- the Court's Opinion and judgment on the legal question raised on appeal. The mandate is ministerial and did not affect the

resolution of the legal question already decided.  The State's argument in the **Evans** case was not that the mandate was prejudicially erroneous or denied the State the relief it sought on the merits.  The State's argument was with the original opinion and  denial of its motion to re-argue it.  The State suffered no prejudice by reason of  the alleged flaw in the clerical process of issuing the mandate that was separate and distinct from the merits of the judgment articulated in the opinion and denial of the motion for re-argument, which the parties and the Superior Court of the State of Delaware received. Notwithstanding the above, according to Shockley, the April 2005 decision, **Evans v. State, 872 A.2d 539**, in his case altered the law to his disadvantage and cannot be applied to him.  In addition, the State never appealed **Crosby v. State, 824 A.2d 894 (Del. 2003)**, which for all purposes under the rule of law became a final decision.  It is not Shockley's fault that the State waived their right to appeal the clearly foreseeable nunc pro tunc decision in **Crosby**.  Equally relevant are the merit and good time credit statutes which provide for the term imposed by the Court to be reduced as have been earned by Shockley which in 1964 the General Assembly enacted **Section 4348** and **Section 4346**, entitled release upon merit and good behavior credits, provides in pertinent part:

> **"A person having served that person's term or terms in incarceration, less merit and good behavior credits as having been earned, shall, upon release, be deemed as released on parole until the expiration of the maximum term or terms for which the person is sentenced.  Section 4346 is entitled Eligibility for Parole."**

Section 4346(a) provides that for purposes of parole eligibility, the term of a sentence was to be reduced by merit and good behavior credits, and Section 4346(c), which provided in part:

> **"that for all purposes of this Section, a person sentenced to imprisonment for life shall be considered as having been sentenced to a fixed term of 45 years."**

When the **Section 4346** parole statute and the **Section 4348** conditional release statute were both enacted in 1964, they were within the same Chapter of the Delaware Code.  Each statute permitted the *__reduction__* of an inmate's sentence through earned merit

and good time credits. See **Richmond v. State, 446 A.2d 1091, 1094 (Del. 1982)**. When those two 1964 statutory enactments are read in pari materia, **Section 4348** incorporates **Section 4346(c)**'s definition of a life sentence as a fixed term of 45 years. See **State Farm Mut. Auto. Ins. Co. v. Wagamon, 541 A.2d 557 (Del. 1988)**. In regard to (TIS) and good time credits, see Letter from Former Corrections Commissioner Robert J. Watson dated June 24, 2994; Exhibit I, and State News Article dated September 18, 2006; Exhibit J.

13.     These statutes are clear and unambiguous, but somehow Respondent's seem to ignore the fact that there has been no amendments to their enforcement. In addition, Respondent's Answer is frivolous and without merit on it's face in terms of violations of Shockley's due process and equal protection rights under the **5th** and **14th Amendments to the United States Constitution**, and the **Ex Post Facto Clause of the United States Constitution**. Again, Respondent's simply ignore the June 30, 1990 Truth-In-Sentencing Act (TIS) Amendments which (1) on it's face, and (2) by it's practical implementation by the State charged with exercising discretion violate the **Ex Post Facto Clause**. Shockley has also presented outside evidence which should require this U.S. District Court to determine "whether, as a matter of fact, the TIS Amendment to the ruling announced in **Evans v. State, 872 A.2d 539 (Del. 2005)** created a significant risk of increased punishment to Shockley by eliminating the maximum punishment imposed by a 45 year term, as well as the opportunities to reduce this term; and replacing this term to an irreducible term based on the natural life of Shockley. Under **Miller v. Florida, 482 U.S. 423 (1987)**, this change makes more onerous the punishment for crimes committed before the enactment – for those crimes that occurred before June 30, 1990; **Id at Shockley's Petition for Writ of Habeas Corpus, passim**. Moreover, ex post facto challenges to changes in the parole review procedures is fact intensive; **Id at Section 4346 et. seq., 4348 and 4381(a)**. For example, see **Foster-Bey, 2005 WL2010181 at *7**, "Order Granting in part and denying in part Defendant's Motion to Dismiss." Prisoners alleged that parole board changed second-degree paroleable life to "Life Means Life" based upon changes to the parole laws that took effect after 1992 even though they were sentenced prior to that date. See also, **Garner v. Jones, 529 U.S. 244, 120 S.Ct. 1362**

14

**(2000)** (issue was whether change in interval from three to eight years for parole reconsideration was an ex post facto violation). The Supreme Court remanded the case with instruction to allow plaintiff an opportunity to engage in[1] discovery to show whether the change in the law created a significant increase in punishment.

14.     Finally, Respondent's are not entitled to deference to the State Court's decisions. Although federal courts on habeas corpus must usually defer to State Court findings of fact, they may not usually defer to State Court applications of law to fact. The process employed by the State Court is defective and the State Court findings in Shockley's case are unsupported by substantial evidence in the State Court record. The same holds true in **Evans v. State, 872 A2d 539 (Del. 2005)**; see also **Taylor v. Maddox, supra; Calderon v. Thompson, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998)**. Because the April 2005 decision in **Evans v. State,** altered the law to Shockley's disadvantage, violated his due process and equal protection under the **5th** and **14th Amendments to the United States Constitution** and the **Ex Post Facto Clause of the United States Constitution** and the decision cannot be applied to Shockley.

Therefore, Shockley on federal habeas corpus is entitled to an evidentiary hearing because he has established a "colorable" claim for relief, and since he has never been accorded a State or federal hearing on his claims; see **Earp v. Oronski, 431 F.3d 1158, 1161 (9th Cir. 2005)**, citing **Townsend v. Sain, 372 U.S. 293 (1963)** and **Keeney v. Tamayo-Reyes, 504 U.S. 1, 5 (1992)**. In stating a "colorable" claim, Shockley was merely required to allege specific facts, which if true, would entitle him to relief. Shockley has satisfied that burden.

---

[1] Petitioner Sylvester Shockley alleges that he has made a sufficient factual showing to establish 'good cause' as required by Habeas Corpus Rule 6(a), for discovery on his claim of actual judicial bias in his case, claiming among other things, that he was denied due process and equal protection under the **5th** and **14th Amendments to the United States Constitution**. Petitioner contends that the **Evans** 2004 holding sparked a media frenzy and an uproar in the State legislature over concern that a wave of violent criminals would be set loose upon the good people of the State of Delaware and prompted the judiciary to reverse itself and withdraw it's prior decision of November, 2004. See **Evans v. State, 872 A.2d 539 (Del. 2005)**, and although it has nothing to do with this case, demonstrates the propensity of mob rule to disregard the liberties enshrined in our most sacred constitutional documents in the name of "security". Petitioner seeks discovery in support of this claim. Specifically, reasonable access to the State's materials in the **Evans** case(s).

## PRAYER FOR RELIEF

**WHEREFORE**, for the reasons set forth herein and in the documents incorporated by reference and attached hereto, Petitioner respectfully requests that the Court:

(1)    Order an evidentiary hearing and appoint Counsel for Petitioner.

(2)    Grant the Writ of Habeas Corpus, remand to re-sentence the Petitioner, or Discovery.

(3)    Grant all other appropriate relief.

Dated: *October 6, 2006*

Sylvester Shockley
In Propria Persona
**Delaware Correctional Center**
**1181 Paddock Road**
**Smyrna, Delaware 19977**

**IN THE SUPREME COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| **SYLVESTER SHOCKLEY,** | ) | |
| | ) | |
| Petitioner Below, | ) | |
| Appellant | ) | |
| | ) | |
| v. | ) | No. 216, 2005 |
| | ) | |
| **STANLEY TAYLOR, Commissioner,** | ) | |
| | ) | |
| Respondent Below, | ) | |
| Appellee | ) | |

## MOTION TO AFFIRM

Pursuant to Rule 25(a), the appellee moves to affirm the judgment of the Superior Court on the grounds that it is manifest on the face of the opening brief that the appeal is without merit for the following reasons:

1. The grand jury indicted Sylvester Shockley in September 1981, charging him with first degree rape, first degree kidnapping, and third degree assault. Super. Ct. ID 81003194DI. Shockley pled guilty in December 1981 to first degree rape, and he was sentenced in March 1982 to life imprisonment.

2. In February 2005, Shockley filed in the Superior Court a petition for a writ of mandamus, seeking to compel the Department of Correction to recalculate his sentence, including the calculation of his good time credit, in accord with the November 2004 decision of this Court in *Evans v. State*. Superior Court summarily dismissed the petition. (A1).

3. The Superior Court decision is clearly correct. The November 2004 decision in *Evans* was withdrawn by an opinion

*EXHIBIT A.*

issued on April 11, 2005.  *Evans v. State*, 872 A.2d 539, 558

(Del. 2005).  Under *Evans*, Shockley's "good time credits only

applied to [his] natural life sentence for purposes of

accelerating [his] parole eligibility date.  Accordingly, . . .

[Shockley] is not eligible for conditional release and must

remain incarcerated until his death, unless he is granted

parole."  *Evans*, 872 A.2d at 558 (footnotes omitted).  A writ of

mandamus issues "to compel the performance of a duty to which the

petitioner has established a clear legal right."  *Clough v.*

*State*, 686 A.2d 158, 159 (Del. 1996).  Because Shockley's

sentence was correctly calculated under *Evans*, he thus failed to

establish that he had "a clear legal right" that would warrant

issuance of the writ.  It therefore follows that dismissal of

Shockley's petition was appropriate.  *See Clough*, 686 A.2d at 158

("dismissal of Clough's petition was appropriate because Clough

has no clear legal right to the requested relief").

    4.  The judgment of the Superior Court should be affirmed.


                                    **Loren C. Meyers**
                                      Del. Bar ID 2210
                                      Chief of Appeals Division
                                      Department of Justice
                                        820 N. French Street
                                        Wilmington, DE 19801
                                        (302) 577-8500
                                        Counsel for Appellee

July 15, 2005


EXHIBIT A.

## CERTIFICATE OF SERVICE

The undersigned, being a member of the Bar of the

Supreme Court of Delaware, hereby certifies that on July 15,

2005, he caused two copies of the attached document to be

placed in the U.S. Mail, first class postage prepaid,

addressed to the following:

Sylvester Shockley
No. 090135
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE 19977


Loren C. Meyers
Chief of Appeals Division
Dept. of Justice

EXHIBIT A.

IN THE SUPREME COURT OF THE STATE OF DELAWARE

SYLVESTER SHOCKLEY,                    §
                                       §
    Petitioner Below-              § No. 216, 2005
    Appellant,                     §
                                       §
    v.                             § Court Below—Superior Court
                                       § of the State of Delaware,
STANLEY TAYLOR,                        § in and for New Castle County
                                       § C.A. No. 05M-02-029
    Respondent Below-              §
    Appellee.                      §

Submitted:  July 15, 2005
Decided:   August 24, 2005

Before **HOLLAND**, **BERGER**, and **JACOBS**, Justices.

### O R D E R

This 24ᵗʰ day of August 2005, the Court has considered the opening brief and the State's motion to affirm. It is manifest that the judgment of the Superior Court, which denied Shockley's petition for a writ of mandamus to recalculate his release date, must be affirmed on the basis of this Court's decision in *Evans v. State*, 872 A.2d 539 (Del. 2005).

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

_____
Justice

*EXHIBIT B.*

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

Sylvester Shockley )
)
vs. )       C.A. No. **05M-02-029-JTV**
)
Comm. Stanley Taylor, et al )
)
)

### ORDER UPON INITIAL REVIEW OF COMPLAINT

The Court having reviewed the complaint:

1. ✓ IT IS ORDERED that the complaint is **DISMISSED** because:

____ The complaint was factually frivolous

____ The complaint was legally frivolous

____ The complaint was malicious.

____ It plainly appears from the face of the complaint that the plaintiff is not entitled to relief.

For the following reasons: _The sentence is appropriate for the reasons stated at the time of sentencing. No additional information has been provided to the Court which would warrant a reduction or modification of this sentence._

Service of process shall not issue.

2. _____ The complaint is **NOT DISMISSED** and service of process shall issue.

**IT IS SO ORDERED**.

_____ J.

DATED: _May 6, 2005_

( ● )

EXHIBIT C.

Westlaw.

FOR EDUCATIONAL USE ONLY

317 A.2d 20.
317 A.2d 20
(Cite as: 317 A.2d 20)

Page 1

▷

Supreme Court of Delaware.
Leroy L. SMITH, Defendant Below, Appellant,
v.
STATE of Delaware, Plaintiff Below, Appellee.

Feb. 15, 1974.

Defendant was convicted in the Superior Court of rape and he appealed. The Supreme Court, Duffy, J., held that defendant was not entitled to compel discovery of police memorandum paraphrasing substance of what father had told police concerning incriminating statements made by defendant to father; thus, failure of State to produce memorandum upon defendant's request did not preclude police officer from testifying as to what the father had told him, but that trial court's comment to jury about pardon and parole and possible consideration thereof by jury in deliberating concerning recommendation of mercy was not harmless error beyond reasonable doubt, in absence of further instructions which might have rendered the error harmless.

Reversed and remanded for new trial.

West Headnotes

[1] Criminal Law ⬡627.7(2)
110k627.7(2) Most Cited Cases

[1] Criminal Law ⬡627.8(6)
110k627.8(6) Most Cited Cases
Defendant was not entitled to compel discovery of police memorandum paraphrasing substance of what father had told police concerning incriminating statements made by defendant to father; thus, failure of State to produce memorandum upon defendant's request for written or recorded statements or confessions made by defendant did not preclude police officer from testifying as to what the father had told him. Superior Court Rules, Criminal rule 16(a), Del.C.Ann.; 11 Del.C. § 3509.

[2] Criminal Law ⬡627.6(4)
110k627.6(4) Most Cited Cases
Defendant cannot discover notes reflecting police officer's recollection of conversation with him or compel discovery of notes which reflect an officer's recollection of a conversation with a third party. Superior Court Rules, Criminal rule 16(a),

Del.C.Ann.; 11 Del.C. § 3509.

[3] Criminal Law ⬡1174(1)
110k1174(1) Most Cited Cases
(Formerly 110k174(1))
Failure to admonish jury on daily basis not to read news accounts of trial is not reversible error, inasmuch as when juror began service on panel he is routinely given a handbook stating that jurors must not read about the case in the newspapers.

[4] Criminal Law ⬡868
110k868 Most Cited Cases

[4] Criminal Law ⬡1144.15
110k1144.15 Most Cited Cases
Court, counsel and litigants are entitled to assume that jurors will follow instructions in handbook for petit jurors stating that jurors must not read about case in newspapers and, if any doubt was raised about validity of that assumption, court should then make an independent determination of the facts.

[5] Criminal Law ⬡633(1)
110k633(1) Most Cited Cases
Conduct of trial is largely within discretion of trial judge.

[6] Criminal Law ⬡852
110k852 Most Cited Cases
For integrity of trial and in interest of justice, trial judge should, at end of each day, caution jury collectively about avoiding accounts of proceedings which may appear in news media, including newspapers, radio and television.

[7] Criminal Law ⬡868
110k868 Most Cited Cases
At commencement of each new trial day, court should inquire of jury, collectively, as to whether any member has in any way been exposed to accounts of proceedings appearing in news media and, if juror responds affirmatively, trial judge should, out of presence of remainder of jury, inquire into nature and extent of the exposure and such inquiry should be made by court, not counsel, and may be conducted in chambers.

[8] Criminal Law ⬡855(1)
110k855(1) Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT D.

Albeut St.Hel was the Superior Court Judge

317 A.2d 20.
317 A.2d 20
(Cite as: 317 A.2d 20)

FOR EDUCATIONAL USE ONLY

Page 2

Fairness and integrity of judicial process make it imperative that jurors secure information about case only as corporate body in courtroom, since only in that way can knowledge of case at hand be presented to jurors in accordance with traditional rules of evidence and be tested by constitutional right of cross-examination.

**[9] Criminal Law ☜868**
110k868 Most Cited Cases
To prevent jurors from being influenced by accounts of proceedings as filtered through third persons, including representatives of news media, trial judge has wide discretion and he should hear and consider in privacy of chambers, matters as to which jury has been excluded, if that be deemed by trial judge necessary to protect jury from media accounts of such matters.

**[10] Criminal Law ☜868**
110k868 Most Cited Cases
Court's ultimate ruling on whether jurors have been influenced by accounts of proceedings by third persons or news media should be made in open court. Del.C.Ann.Const. art. 1, § § 7, 9.

**[11] Criminal Law ☜635**
110k635 Most Cited Cases
Decision to hear in chambers matter as to whether juror has been influenced by accounts of proceedings as filtered through third parties, including news media, should be made only after full consideration of constitutional right to public trial and requirement that all courts be open. Del.C.Ann.Const. art. 1, § § 7, 9.

**[12] Criminal Law ☜868**
110k868 Most Cited Cases
Where, on second day of trial, defense counsel brought to court's attention report in local newspaper containing reference to defendant's prior criminal record, trial court did not abuse its discretion in conducting voir dire of panel collectively to determine whether article had been read by jurors or discussed by them, rather than individually examining each juror. Del.C.Ann.Const. art. 1, § § 7, 9.

**[13] Criminal Law ☜731**
110k731 Most Cited Cases
Jury's function in criminal case is to determine guilt or innocence.

**[14] Rape ☜60**

321k60 Most Cited Cases
Jury's function in rape case, if guilt be found, is to recommend mercy or not.

**[15] Criminal Law ☜749**
110k749 Most Cited Cases
It is not within scope of jury's duty to consider possibility of postconviction clemency.

**[16] Criminal Law ☜857(1)**
110k857(1) Most Cited Cases
It is impermissible for jury to consider and attempt to evaluate uncertain effects of potential postconviction remedies.

**[17] Criminal Law ☜863(2)**
110k863(2) Most Cited Cases
When confronted with request by jurors concerning effect of pardon and parole upon sentence, court should instruct jury that its duty is to decide guilt or innocence and only, in appropriate instances, to either recommend mercy or not and in no circumstance should jury concern itself with what may occur after verdict.

**[18] Criminal Law ☜1174(1)**
110k1174(1) Most Cited Cases
(Formerly 110k174(1))
Court's comment to jury about pardon and parole and possible consideration thereof by jury when it deliberated as to whether or not to recommend mercy was not harmless error beyond reasonable doubt, in absence of further instructions which might have rendered the error harmless.
**\*21** Upon appeal from Superior Court.

Richard M. Baumeister, Asst. Public Defender, for appellant.

Joseph A. Hurley, Deputy Atty. Gen. for appellee.

HARRMANN, Chief Justice, CAREY and DUFFY, Associate Justices, sitting.

**\*22** DUFFY, Justice:

Defendant was convicted of rape and appeals on three grounds.

I

First, defendant argues that he was denied pretrial discovery in violation of Superior Court Criminal Rule 16,[FN1] Del.C.Ann.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

FN1. Rule 16(a) states in part:
'(a) Defendant's Statements; Reports of Examinations and Tests; Defendant's Grand Jury Testimony.    Upon motion of a defendant the court may order the Attorney General to permit the defendant to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or a co-defendant (whether or not charged as a principal, accomplice or accessory in the same or in a separate proceeding), or copies thereof, which are known by the Attorney General to be within the possession, custody or control of the State, . . . .'

[1] Prior to trial, defendant requested 'written or recorded (in any form whatsoever) statements or confessions' made by defendant; the State answered by saying that none existed.  At trial, however, testimony indicated that defendant had made certain incriminating statements to his father who subsequently related them to the police.  Sometime thereafter a police memorandum was made, paraphrasing the substance of what the father had said. Over defendant's objection, a police officer testified at trial to the incriminating statements related to him by the father.[FN2]    Defendant contends that the memorandum was discoverable under the Rule and, since it was not produced by the State prior to trial, the Trial Judge should not have permitted the police officer to testify as to what the father told him.

FN2. 11 Del.C. s 3509 provides:
'(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.
(b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not.  The rule shall likewise apply with or without a showing of surprise by the introducing party.'

[2] The issue is controlled by our decision in Ray v. State, Del.Supr., 262 A.2d 643 (1970).  There, we held that notes made by a police officer based upon oral statements to him by defendant were not within the purview of Rule 16(a).  Here, defendant's statement was made, not to the police but to his father; and the notes were based upon what the father

told a police officer. Under Ray a defendant cannot discover notes which reflect a police officer's recollection of a conversation with him and, A fortiori, he cannot compel discovery of notes which reflect an officer's recollection of a conversation with a third person.

We hold that the oral statement made by defendant to his father, although reduced to paraphrase form in a police memorandum, was not discoverable under Rule 16(a).

II

Second, defendant argues that he was prejudiced by failure of the Trial Judge to instruct the jury not to read news accounts of the trial.  At the end of the first day of trial the Judge admonished the jury not to discuss the case with anyone but said nothing about reading newspaper reports.  When trial began next day defense counsel brought to the Court's attention a report in a local newspaper (the Morning News) about the trial which contained a reference to defendant's prior criminal record, including a four-year sentence for conviction of assault with intent to rape.    Defense counsel requested the Court to individually examine each juror on Voir dire to determine whether the article had been read by the jurors or discussed by them.  The Court denied the request but conducted a Voir dire of the panel collectively.  The examination revealed that one juror had *23 read the report but had not discussed it with any other juror.    That juror was dismissed and replaced by an alternate.

Defendant makes two arguments based upon these events: he says that reversible error occurred when the Court dismissed the jury at the end of the first day without an admonition as to news accounts of the trial, and, he continues, the Judge compounded the error by failing to conduct a separate examination of each juror.

[3][4] In our view, failure to admonish the jury on a daily basis is not reversible error.  When a juror begins service on a panel he is routinely given a copy of A Handbook for Petit Jurors Serving on the Superior Court of the State of Delaware which provides in part:
'Jurors are expected to use all the experience, common sense and common knowledge they possess.  But they are not to rely on any private source of information.    Thus, they should be careful, during the trial, not to discuss the case at home or elsewhere.  A fact that a juror gets from a private source may be only half true.  It may be a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

317 A.2d 20.                    FOR EDUCATIONAL USE ONLY                              Page 4
317 A.2d 20
(Cite as: 317 A.2d 20)

fact that can be explained or perhaps the law of evidence requires it should have no influence on the outcome. At any rate, it is only fair that the parties have a chance to know and explain or answer any facts that matter in the case.

Jurors must not talk about the case with others not on the jury and must not read about the case in the newspapers. They should avoid radio and television broadcasts that might mention the case. The jury's verdict must be based on nothing else but the evidence before the Court.

Breaking these rules is likely to confuse a juror. It may be hard to separate in a person's mind the court testimony and reports coming from other sources and such outside reports may be biased or inaccurate.'

See State v. Halko, Del.Super., 193 A.2d 817 (1963). The Court, counsel and the litigants are entitled to assume that jurors will follow these instructions, including those pertaining to newspapers; if any doubt is raised about the validity of that assumption the Court should then make an independent determination of the facts.

[5][6][7] It is well settled that the conduct of a trial is largely within the discretion of the Trial Judge and, within the context of what occurred in this case, we suggest a few guidelines[FN2A] in the exercise of that discretion: In our view, for the integrity of the trial and in the interests of justice, the Trial Judge should, at the end of each day, caution the trial jury collectively about avoiding accounts of the proceeding which may appear in the news media, including newspapers, radio and television.[FN3] At the commencement of each new trial day the Court should inquire of the jury, collectively, as to whether any member has in any way been exposed to such accounts; when a juror responds affirmatively the Trial Judge should, out of the presence of the remainder of the jury, inquire into the nature and extent of the exposure. Such inquiry should be made by the Court, not counsel, and may be conducted in chambers.

> FN2A. Guidelines, as here stated, are not to be considered mandates such as would support assertion of reversible error Per se.

> FN3. The Approved ABA Standards Relating to Fair Trial and Free Press, s 3.5(e), includes suggested cautionary instructions to jurors.

[8][9][10][11] We take occasion to emphasize that fairness, and indeed the integrity of the judicial

process, make it imperative that jurors secure information about the case only as a corporate body in the courtroom. Only in that way can knowledge of the case at hand be presented to jurors in accordance with traditional rules of evidence and be tested by the constitutional right of cross-examination. Compare *24Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). Since our courts are open and media access is ordinarily routine, it is imperative that jurors avoid being influenced by accounts of the proceedings as filtered through third persons, including representatives of the news media. To accomplish that objective a Trial Judge has a wide discretion. Thus he should hear and consider in the privacy of chambers, matters as to which the jury has been excluded, if that be deemed by the Trial Judge necessary to protect the jury from media accounts of such matters. The Court's ultimate ruling on any such matter should, of course, be made in open court. A decision to hear such matters in chambers should be made only after full consideration of the constitutional right to a public trial, Art. 1, s 7, Del.C.Ann., and the requirement that all courts shall be open, Art. 1, s 9. Compare Lecates v. Lecates, Del.Super., 190 A. 294 (1937); see the discussion in 23 C.J.S., Criminal Law s 963.[FN4]

> FN4. Section 3.5(d) of the ABA Standards, supra, states:
> '(d) Exclusion of the public from hearings or arguments outside the presence of the jury.
> If the jury is not sequestered, the defendant shall be permitted to move that the public be excluded from any portion of the trial that takes place outside the presence of the jury on the ground that dissemination of evidence or argument adduced at the hearing is likely to interfere with the defendant's right to a fair trial by an impartial jury. The motion shall be granted unless it is determined that there is no substantial likelihood of such interference. With the consent of the defendant, the court may take such action on its own motion or at the suggestion of the prosecution. Whenever such action is taken, a complete record of the proceedings from which the public has been excluded shall be kept and shall be made available to the public following the completion of the trial. Nothing in this recommendation is intended to interfere with the power of the court, in connection with any hearing held outside the presence of the jury, to caution those present that dissemination of specified information by any means of public communication,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOR EDUCATIONAL USE ONLY

317 A.2d 20.
317 A.2d 20
(Cite as: 317 A.2d 20)

Page 5

prior to the rendering of the verdict, may jeopardize the right to a fair trial by an impartial jury.'

The Commentary includes the following:

'Subsection (d) of section 3.5 provides that hearings during trial held outside the presence of the jury shall be closed when there is a substantial likelihood that dissemination of evidence or argument adduced at the hearing will interfere with the defendant's right to a fair trial. There are a number of cases in which such dissemination has raised serious questions of possible prejudice, and the exclusion of the public from the courtroom, or the holding of arguments at the side-bar or in chambers, can avoid this danger.'

[12] The way in which the Trial Judge conducted the Voir dire in this case was entirely within his discretion and, absent a showing of abuse, he will not be reversed. We find no abuse in the Court's decision to make the inquiry collectively and not individually. Compare Williams v. State, Del.Supr., 205 A.2d 9 (1963); Smith v. United States, 8 Cir., 236 F.2d 260 (1956), cert. den. 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118 (1956); People v. Marino, 95 Ill.App.2d 369, 238 N.E.2d 245 (1968), aff'd 44 Ill.2d 562, 256 N.E.2d 770 (1970); State v. Schlagel, Mo.Supr., 490 S.W.2d 81 (1973).

III

Finally, we consider an argument based upon the Trial Judge's instructions to the jury in answer to a question asked after deliberation had begun.

After retiring the jury sent to the Court a note asking, '. . . could you please clarify in terms of years what life imprisonment means?' The Court reviewed the matter with counsel and then answered the question as follows:

'I will just read portions of a statute, which is 11 Delaware Code, Section 4346. It merely says that for all purposes, a person sentenced to imprisonment for life shall be considered as having been sentenced to a fixed term of forty-five years. Let me ask you this: Are there any further questions? If there are, I pass *25 you this pad and you can write them down.'

In response to one such question ('Would a minimum sentence, say, of three years mean the person would have to serve the whole three years?'), the Court stated:

'You are asking about the minimum sentence. That's the minimum, not the maximum, a minimum

of three years. If we sentence to a minimum of three years, as far as we are concerned, that would be the sentence. But this does not take into account procedures subsequent to sentencing such as what a Pardon Board action might do or Parole Board action might do or what the prison may do in reduction of sentence in accordance with good time served with which this Court has no connection. In other words, our function is to give the sentence. What happens after our function is really--It's the concern of the Court, but it is not our jurisdiction, you see. Is there anything else?

Before verdict defendant moved for a mistrial on the ground that reference to pardon, parole or other post-conviction remedy was improper. The motion was denied and the jury returned a verdict of guilty of rape, without a recommendation of mercy. The sentence of life imprisonment, mandatory without a mercy recommendation,[FN5] was imposed. Defendant now argues that it was reversible error for the Trial Court to comment about the possibility of pardon or parole. We agree.

FN5. 11 Del.C. s 781 (now repealed) provided:

'Whoever commits the crime of rape; Shall be guilty of felony and shall suffer life imprisonment. If the jury at the time of rendering their verdict recommends the defendant to mercy, the court may impose a sentence for any period not less than 3 years, instead of life imprisonment.'

[13][14] The jury's function is to determine guilt or innocence and, in this case, if guilt be found, to recommend mercy or not.

[15] In a majority of jurisdictions it is not within the scope of a jury's duty to consider the possibility of post-conviction clemency. See 35 A.L.R.2d 769 and 12 A.L.R.3d 832. We know of no dissent from that principle in Delaware law or practice and we affirm it here.

Basically, at least two evils may occur as a result of an instruction concerning possible pardon, parole or probation. First, such comment to a jury may 'becloud the issue before them and open the way to a compromise verdict.' Lovely v. United States, 4 Cir., 169 F.2d 386 (1948). That is, knowledge on the part of a jury that there is possible review by other governmental authorities may cause that jury to avoid its responsibility and compromise on the question of guilt. See Commonwealth v. Mills, 350 Pa. 478, 39

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT D.

317 A.2d 20.
317 A.2d 20
**(Cite as: 317 A.2d 20)**

A.2d 572 (1944); People v. Morse, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33 (1964). Of course, it can be said that such procedures are in a general sense matters of common knowledge but, manifestly, any comment by the Court relates them to the case at hand and draws the jury's attention away from performance of its proper task. And such comment may imply to a jury that if it mistakenly convicts an innocent man, or mistakenly fails to recommend mercy, the error may be corrected by others; under such circumstances a conviction is more likely, and a recommendation of mercy is less likely.

Second, relying upon the possibility of parole, probation or the like, a jury may be tempted to compensate for what it considers future leniency or release, and deal with the case more severely than it might otherwise. Clearly, if post-conviction clemency upon which a jury has relied does not materialize, then a defendant is left with a verdict that the jury did not intend. This point has received much consideration in decisions dealing with the issue. See, e.g., Lawley v. State, 264 Ala. 283, 87 So.2d 433 (1956); *26Thompson v. State, 203 Ga. 416, 47 S.E.2d 54 (1948); Porter v. State, 177 Tenn. 515, 151 S.W.2d 171 (1941); Jones v. Commonwealth, 194 Va. 273, 72 S.E.2d 693 (1952). Our system of justice should not permit this sort of speculation and a jury's possible compensation therefor.

[16] We hold that it is impermissible for a jury to consider and attempt to evaluate the uncertain effects of potential post-conviction remedies. Such conjecture is not within the traditional perimeters of a jury's function and has no place in our system of justice in this State. Such conjecture, it is reasonable to believe, may have made the difference, in the instant case, between a comparatively minor prison sentence which may have followed a mercy recommendation and the life imprisonment which is mandatory on the present verdict without such recommendation.

[17] When confronted with a request of the kind made here, the Court should instruct the jury that its duty is to decide guilt or innocence only (and, in appropriate instances, to either recommend mercy or not); in no circumstance should the jury concern itself with what may occur after verdict.

[18] It is with reluctance that we reverse the judgment below, and in so doing we emphasize that guilt or innocence of the charge of rape is not the determinative issue on which the ruling is made. Our decision is based entirely on the Court's comment to

the jury about pardon and parole, and possible consideration thereof by the jury when it deliberated whether or not to recommend mercy. It is clear from the record that the Trial Judge realized the significance of what he had said and it is regrettable that counsel were unable to agree on further instructions which might have rendered the error harmless. But, taking the record as it is, we are unable to say the error is harmless beyond a reasonable doubt, which is the test fixed by the Supreme Court in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Compare Mealey v. Delaware, 3 Cir., 489 F.2d 993 (1973).

Reversed and remanded for a new trial.

317 A.2d 20

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JAMES G. BROWN,                          :
                                         :
            Petitioner,                  :
                                         :
     v.                                  :    Civil Action No. 89-574-JJF
                                         :
WALTER W. REDMAN, Warden,                :
Delaware Correctional Center,            :
and CHARLES M. OBERLY, III,              :
Attorney General of the                  :
State of Delaware,                       :
                                         :
            Respondents.                 :

-------------------------------------------

James G. Brown.  Pro Se Petitioner.

Loren C. Meyers, Esquire, Deputy Attorney General, Department of
Justice, Wilmington, Delaware.  Attorney for Respondents.

-------------------------------------------

MEMORANDUM OPINION

June 14, 1991

Wilmington, Delaware

EXHIBIT E.



FARNAN, District Judge.

## I. PROCEDURAL AND FACTUAL HISTORY

On May 21, 1988, a woman was sexually assaulted and robbed near the grounds of the Friends Lower School in Delaware. The woman informed the police that she thought her assailant was a black male who was wearing a green shirt and possibly gray pants. She also stated that the assailant had stolen a ring from her. On June 7, 1988, a pawn shop informed the police that the stolen ring had been sold to them by a person identifying himself as James G. Brown ("petitioner"). Petitioner was placed at the scene of the assault a short time before its occurrence by a passerby, Thomas Knox ("Knox"), who indicated that the person he had seen was wearing a green shirt and gray pants. Knox later identified petitioner through a photo lineup. Petitioner was arrested on June 8, 1988, and he confessed to the commission of the crimes.

Brown was indicted on charges of first degree unlawful sexual intercourse, first degree kidnapping, and second degree robbery. Following a four day suppression hearing, the Superior Court denied petitioner's motion to suppress his statement to the police. Petitioner's jury trial commenced on March 20, 1989. On March 21, 1989, petitioner elected to plead guilty to unlawful sexual intercourse, in return for dismissal of the kidnapping and robbery charges. The Court accepted petitioner's plea of guilty after the following colloquy:

> THE COURT: Are you James G. Brown?
>
> THE DEFENDANT: Yes.

THE COURT:    Are you presently under the influence of alcohol or drugs?

THE DEFENDANT: No, I'm not.

THE COURT:    Have you freely and voluntarily decided to enter this pleas of guilty today?

THE DEFENDANT: Yes.

THE COURT:    I have a plea agreement that has been handed up to the Court that indicates that you will plead guilty to Count II of the Indictment, unlawful sexual intercourse in the first degree.    The State will enter a nolle pros or drop the remaining two counts of the Indictment charging you with kidnapping first degree and robbery second degree.    Is that your understanding of the agreement?

THE DEFENDANT: Yes, it is.

THE COURT:    Has anybody promised you anything other than what is stated in that agreement to make you plead guilty today?

THE DEFENDANT:    It stated 20 years' imprisonment, possible parole at 20 years -- 45 years, that's it.

THE COURT:    Other than what is in that agreement, nobody has promised you anything?

THE DEFENDANT: No.

THE COURT:    And you understand that they are talking about the fact that there is a mandatory sentence of 20 years that must be served and that there's a sentence of life that must be imposed, which is equivalent to a 45-year term, so that you would be eligible for parole in 20 years.    Is that your understanding?

THE DEFENDANT: Yes.

THE COURT:    Has anybody threatened you or coerced you to make you plead guilty today?

THE DEFENDANT: No.

2

EXHIBIT E.

THE COURT:  You understand that by entering a plea of guilty you will be giving up your right to have a trial in this case?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that you will be giving up all of those constitutional rights that go along with a trial?

THE DEFENDANT:  Yes.

THE COURT:    Those  rights  include  the presumption of innocence till the State can prove each element of the crimes charged against you beyond a reasonable doubt; the right to a speedy public jury trial; the right to hear and question those witnesses who appear against you, as well as to call witnesses or present evidence on your own behalf; the right to testify or not testify, as you choose; and the right to appeal any decision of this Court; by entering a plea of guilty, you give up all of those rights.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Do you further understand, as I have stated, that there is a penalty in this case for the offense of life imprisonment with a 20-year mandatory minimum sentence?

THE DEFENDANT:  Yes.

THE COURT:   Has anybody promised you what sentence the Court will impose in this case? It is a mandatory sentence, so it must be imposed.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Your counsel has indicated that you were not on probation or parole at the time of this offense; is that correct?

THE DEFENDANT: Yes. I don't have a record at all.

THE COURT: Do you further understand that by pleading guilty to a felony you will lose certain rights, including the right to vote,

3

to hold public office, to be a juror, to own
or possess a deadly weapon?

THE DEFENDANT: Yes.

THE COURT: Have you discussed your case and
your rights with your attorney?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with her advice?

THE DEFENDANT: Yes.

THE COURT: We understand that yesterday you
had a disagreement with your attorney. Do you
feel at this time that she is giving you her
best advice on these charges?

THE DEFENDANT: Yes, it is her best advice,
yes, yes.

THE COURT: Are you entering this plea because
you feel that you will likely be convicted if
this trial continues?

THE DEFENDANT: Yes.

THE COURT: Do you understand that, if the
Court accepts your plea, the next step in this
proceeding will be sentencing, at which time
you will be represented by your lawyer?

THE DEFENDANT: Yes. One question.

THE COURT: Yes.

THE DEFENDANT: Will you be doing the
sentencing?

THE COURT: Yes.

THE DEFENDANT: Could I be sentenced now?

THE COURT: If you want to, there is no reason
why you shouldn't be sentenced. That is your
option.

THE DEFENDANT: That's what I want.

THE COURT: Count II of the Indictment charges
that on or about the 21st day of May, 1988, in

4

the County of new Castle, State of Delaware, you did intentionally engage in sexual intercourse with Armistead Belloli by putting your penis in the victim's vagina without the victim's consent and the Defendant was not the victim's voluntary social companion on the occasion of the crime and had not been permitted sexual intercourse during the previous 12 months. That charges you with the crime of unlawful sexual intercourse first degree. Are you guilty of that offense?

THE DEFENDANT:  Yes.

THE COURT:   I find that the guilty plea is knowingly and intelligently made.   I direct that a finding of guilty be entered.

Transcript ("Tr."), March 21, 1989, at 9-14.

It should be noted that prior to the aforementioned colloquy the following representations were made to the court:

MR. LETANG: I would like a colloquy with the Court, if I could, suggestively, in light of yesterday's in camera discussion with the parties, to have the Court make an inquiry and to establish satisfactorily that the entry of this plea is not a product of what the subject matter of discussions were yesterday with respect to counsel's and client's problems but in fact this is a plea that is knowingly, voluntarily entered as a result of the potential consequences had this matter gone to the jury....

. . .

MS. PERILLO:   [A] discussion about the possibility of a plea disposition in this case did not come up for the first time either last night or this morning, but it is a matter that ... the Defendant and myself have talked about periodically.

. . .

I would like the record to reflect, and I believe Mr. Letang would confirm this, that I had made efforts over the course of this case, including as recently as this morning, to persuade the State to offer a plea that would

5

be more lenient....But Mr. Letang was unreceptive to my pleas in that regard and was firm that this was the best plea offer the State was going to be extending.

. . .

I had previously discussed with the Defendant the sentencing consequences of each and every one of these charges, and we went over those again last night when I saw him at Gander Hill and also again this morning with respect to the further discussions about a plea. The Defendant, after commencement of trial yesterday, did indicate to me that he would consider the entry of a plea in the case, I think in the belief that the evidence appeared to be more or less overwhelming and a conviction very likely to result at trial. After that indication from the Defendant yesterday afternoon, I did meet with him for about an hour at Gander Hill last night and we did discuss that possibility, and then this morning we did so again. The Defendant also had an opportunity to speak with his wife this morning, and his sister, both of whom are in the courtroom at the present time and both of whom recommended in favor of the plea disposition. The Defendant's wife and sister, as well as myself, did make clear to the Defendant that all we can do is make a recommendation to him about what we feel is in his best interest, however, the ultimate decision about how to handle the case must be his and is his, and I believe it is his decision, however, that he arrived at.

. . .

I felt, after the Court's meeting with the Defendant yesterday morning, that the situation with respect to the Defendant and myself did improve somewhat and he seemed to be more open and communicating with me during the course of the trial yesterday and also at Gander Hill last night and in the Courthouse this morning. I feel that the problems that he had yesterday we surmounted but that certainly the Court should ask him that. I have done everything I possibly can to help the Defendant in this case, both by way of preparation of the case and explaining to him everything that I could in as much detail as I could, and I don't think there's any more that I could have done, and I am hopeful that he is satisfied with my representation.

Tr. at 3-8.

After accepting petitioner's guilty plea, the Court granted petitioner's request to be sentenced immediately. The following colloquy took place:

> THE DEFENDANT: Will you be doing the sentencing?
>
> THE COURT: Yes.
>
> THE DEFENDANT: Could I be sentenced now?
>
> THE COURT: If you want to, there is no reason why you shouldn't be sentenced. That is your option.
>
> THE DEFENDANT: That's what I want.
>
> . . .
>
> THE COURT: The defendant has indicated a desire to be sentenced at this time.
>
> MS. PERILLO: Your Honor, I think it would be easier to go forward with the sentencing so, I guess, everybody can begin picking up the pieces. I feel very regretful that there is no option with respect to the sentence the Court has to impose. There are several factors that I think are mitigating in character in this case but there's not even any point in really discussing that. We would ask the Court to proceed with sentencing.
>
> THE COURT: Does the State have anything that they wish to say at this time?
>
> MR. LETANG: Your Honor, the State has nothing to add to the record that the Court has before it and we are not opposed to immediate sentencing today.
>
> THE COURT: Mr. Brown, is there anything that you would like to say at this time?
>
> THE DEFENDANT: I don't have a tremendous amount to say. I'm sorry for the victim and

7

myself. That's the situation. I mean, that's about it. I mean, what else can I say?

THE COURT: Mr. Brown, as you know, there's no discretion in what the Court can do in this case.

THE DEFENDANT: I know, 45 years.

THE COURT: I have to impose that sentence and I am going to do that....

Tr. at 13-15.

Following his sentencing, petitioner sought to withdraw his guilty plea, arguing ineffective assistance of counsel. The Superior Court denied petitioner's request. On appeal, the Supreme Court summarily affirmed the Superior Court's decision. <u>Brown v. State</u>, No. 186, 1989 (Del. Sept. 11, 1989).

Petitioner has instituted this habeas corpus action, alleging (1) error by the Delaware Supreme Court on appeal in addressing only petitioner's attempted withdrawal of guilty plea, and not his other claims of trial error; (2) ineffective assistance of counsel; (3) denial of lower court transcripts in prosecuting his appeal; (4) lack of probable cause for arrest and search warrants; (5) Grand Jury Indictment allegedly based on false information; (6) falsification of evidence;  (7) involuntary confession; and (8) lack of evidence connecting defendant to the crime.[1]

---

1.  In his habeas petition, petitioner alleges as separate grounds for habeas relief the following: (1) alibi defense for petitioner; (2) lack of positive identification of petitioner by both the victim and the witness; (3) alteration of victim's and witness' statements by the police; (4) negative Federal Bureau of
(continued...)

**8**

EXHIBIT E.

As for the issue of the transcripts, the State contends that petitioner has failed to exhaust this issue in the state courts, thus requiring dismissal of petitioner's entire habeas petition on exhaustion grounds, unless petitioner voluntarily dismisses that particular issue.

## II.  EXHAUSTION OF STATE REMEDIES

The Court concludes that all issues petitioner raises in his habeas petition have been exhausted in the state courts.  Thus, habeas review is proper on all issues raised by petitioner. Specifically, regarding petitioner's claim that he was denied transcripts in prosecuting his appeal in the state courts, the Court concludes that this issue was exhausted in the state courts. In his brief to the Delaware Supreme Court, in an appeal of the Delaware Superior Court's decision denying petitioner's motion to withdraw his guilty plea, petitioner put the Supreme Court on notice that he was filing his appeal without the aid of transcripts.  See Appellant's Brief in the Delaware Supreme Court, at p. 1.   The Supreme Court summarily affirmed the Superior's Court's denial of his motion to withdraw his guilty plea, without discussing the transcript issue.   The State contends that petitioner's brief mention of the transcript issue in his appellate

---

1.  (...continued)
Investigation ("F.B.I.") test results of petitioner's hair and fiber samples; and (5) bogus composite sketch of petitioner.   The Court will address the above contentions of petitioner collectively under the heading of "lack of evidence connecting petitioner to the offense."

9

brief is insufficient to meet the exhaustion requirement. The Court disagrees.

"The exhaustion requirement of 28 U.S.C. § 2254 (b)-(c) has been judicially interpreted to mean that claims must have been presented to the state courts; they need not have been considered or discussed by those courts." Swanger v. Zimmerman, 750 F.2d 291, 295 (3d Cir. 1984) (emphasis in original) (citing Picard v. Connor, 404 U.S. 270, 275 (1971)). Discussion of a particular issue in an appellate court's opinion is not necessary for exhaustion to be satisfied. Id. (citing Smith v. Digmon, 434 U.S. 332, 333 (1978)). The Court concludes that by including this issue in his brief to the Delaware Supreme Court, petitioner put the state courts on notice of this claim, and thus satisfied the exhaustion requirement.

## III.   LEGAL STANDARDS

The United States Supreme Court has stated that "the guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned." Blackledge v. Allison, 431 U.S. 63, 71 (1977).

In Tollett v. Henderson, the Supreme Court stated:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only

10

> attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann [v. Richardson, 397 U.S. 759 (1970)] [see McMann below].

411 U.S. 258, 267 (1973).

The Supreme Court has enunciated the standards for determining the validity of a guilty plea:



> The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' North Carolina v. Alford, 400 U.S. 25, 31 (1970); see Boykin v. Alabama, 395 U.S. 238, 242 (1969); Machibroda v. United States, 368 U.S. 487, 493 (1962)....Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was 'within the range of competence demanded of attorneys in criminal cases.' McMann v. Richardson, 397 U.S. 759, 771 (1970). As we explained in Tollett v. Henderson, 411 U.S. 258 (1973), a defendant who pleads guilty upon the advice of counsel 'may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann.' Id., at 267.

. . .



> We hold, therefore, that the two-part Strickland v. Washington [466 U.S. 668 (1984)] test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the Strickland v. Washington test is nothing more than a restatement of the standard of attorney competence already set forth in Tollett v. Henderson, supra, and McMann v. Richardson, supra. The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally

11

ineffective performance affected the outcome
of the plea process.  In other words, in order
to satisfy the "prejudice" requirement, <u>the
defendant must show that there is a reasonable
probability that, but for counsel's errors, he
would not have pleaded guilty and would have
insisted on going to trial.</u>

<u>Hill v. Lockhart</u>, 474 U.S. 52, 56-59 (1985).

## IV.  DISCUSSION

### A.  Alleged Error by the Delaware Supreme Court

As set forth above, petitioner plead guilty in Delaware
Superior Court ("Superior Court"), and attempted to withdraw his
guilty plea after sentencing.   The Superior Court denied
petitioner's motion to withdraw his guilty plea, and petitioner
appealed to the Delaware Supreme Court. The Delaware Supreme Court
summarily affirmed the Superior Court's denial of petitioner's
motion to withdraw his guilty plea under Delaware Supreme Court
Rule 25(a).  Petitioner claims error in the Delaware Supreme not
ruling on the additional claims that petitioner raised in his brief
to the Delaware Supreme Court.

The Court first notes that the Delaware Supreme Court's
summary affirmance of the Superior Court decision is a resolution
of the matters petitioner raised.   The Court is unaware of a
requirement that an appellate tribunal do more, unless it so
chooses, then to state it has considered the contentions petitioner
raises on appeal and finds them to be without merit.

### B.  Ineffective Assistance of Counsel

Petitioner  alleges  the  following  as  evidence  of
ineffectiveness of counsel: (1) defense counsel's failure at the

12

suppression hearing to "prove" the whereabouts of petitioner the night of the crime; (2) counsel's failure to use the F.B.I. test results of petitioner's hair and fiber samples at the suppression hearing to demonstrate that petitioner could not have committed the crime; (3) counsel's failure to prove that petitioner's confession was involuntary, based upon the alleged unbearable conditions of petitioner's cell at the time he confessed; (4) counsel's failure at the suppression hearing to extract and use alleged inconsistencies in his confession to raise a question as to its validity; (5) counsel's failure to timely produce the witnesses who would testify in petitioner's favor; (6) counsel's decision not to request an evidentiary hearing; (7) counsel's introduction of a plea agreement allegedly without petitioner's knowledge; (8) counsel's failure to object to allegedly falsified fingerprint evidence; (9) counsel's alleged use of petitioner's relationship with his wife to force petitioner to plead guilty; (10) counsel's failure to object at the suppression hearing to the State Medical Examiner testifying from his notes regarding the absence of cocaine in petitioner's bloodstream when his confession was taken; and (11) counsel's failure to file a motion for a Speedy Trial.

Generally, the only purpose of a suppression hearing is to determine whether a defendant's confession was voluntary after a knowing waiver of rights, and thus should be admitted at trial. Therefore, as a preliminary matter, there can be no error from defense counsel's failure at the suppression hearing (1) to introduce alibi evidence on behalf of the defendant, through the

13

production of witnesses or other evidence; and (2) to introduce test results that prove that the defendant could not have committed the crime.    Likewise, there can be no error in defense counsel's failure to request an evidentiary hearing to test the sufficiency of the evidence against petitioner.    The sufficiency of the evidence may be tested at a preliminary hearing where the court determines whether there is sufficient evidence to establish that a crime has been committed and the defendant is in some way connected to the crime in order to hold the defendant for trial. However, except for a preliminary hearing, the sufficiency of evidence is tested at trial.

With regard to defense counsel's alleged failure to timely produce witnesses who would testify on petitioner's behalf,[2] the Court concludes that not only has petitioner failed to demonstrate that defense counsel's action in this regard was "not within the range of competence demanded of attorneys in criminal cases" as required by McMann, supra, but that petitioner has also failed to demonstrate any prejudice as required by the second part of the Strickland test outlined above.    See Hill, supra.

Specifically, while petitioner claims error in the timeliness of counsel's actions in interviewing witnesses identified by petitioner, the Court notes that petitioner did not enter his guilty plea until one month after these witnesses were

---

2.    Petitioner claims as error the fact that while counsel was in possession of petitioner's witness list since October 29, 1988, counsel did not interview defense witness until February 23, 1989.    Habeas Petition of James G. Brown ("Pet."), at 8-5.

14

interviewed by counsel.  The Court finds that defense counsel had
ample time to interview and present these witnesses, and that
petitioner cannot now object to the witnesses not being called to
testify on his behalf unless petitioner can satisfy the two prongs
of the Strickland test.   Petitioner must demonstrate first that
their testimony would have been favorable to him, and second that
it is more likely than not that but for counsel's failure to
present the testimony of these witnesses, the result would have
been different.  As noted above, petitioner failed to satisfy both
prongs.

Petitioner additionally contends that counsel committed
error at the suppression hearing in failing to object to the State
Medical Examiner testifying from his notes regarding the absence of
cocaine in petitioner's bloodstream at the time he confessed.
Petitioner claims that no laboratory report was ever produced, and
claims error in that the sole basis for the State Medical
Examiner's report was his personal notes. Petitioner further takes
objection to his counsel not calling an expert witness to testify
to the manifestations of cocaine use on a person, and to counsel
not calling as witnesses the persons petitioner alleges
participated with him in the ingestion of the cocaine.  Petitioner
also contends that counsel should have introduced medical records
which pertain to petitioner's history of drug use.

At the suppression hearing, counsel questioned both
petitioner and his wife as to petitioner's history of drug usage
and his alleged usage of drugs the night of the offense.  Further,

15

contrary to petitioner's assertions, the laboratory report containing the analysis of petitioner's blood was produced at the hearing, and the State Medical Examiner testified as to its contents.    Tr. Supp., November 28, 1988, at 6.    In addition, defense counsel cross-examined the Medical Examiner as to his knowledge and findings. See Tr. Supp., November 28, 1988, at 8-19. The Court concludes that as to petitioner's remaining contentions regarding petitioner's drug usage, based on the record adduced at the suppression hearing, petitioner has failed to prove that defense counsel's actions were not within the range of competence expected of criminal defense attorneys.

As to petitioner's other contentions, in Blackledge the Supreme Court stated:

> the representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open court carry a strong presumption of verity.    The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

431 U.S. at 73-74 (citation omitted).

The Court concludes that the following contentions of petitioner are mere conclusory allegations, unsupported by the record, thus warranting summary dismissal: (1) counsel's alleged failure to inquire into the conditions of petitioner's cell in

16

order to prove that petitioner's confession was involuntary;[3] (2) counsel's alleged failure to inquire into the inconsistencies of petitioner's statement at the suppression hearing;[4] (3) counsel's failure to object to allegedly falsified fingerprint evidence; (4) counsel's alleged use of petitioner's relationship with his wife to force petitioner to enter a guilty plea;[5] (5) counsel's introduction of the plea agreement allegedly without petitioner's knowledge;[6] and (6) counsel's failure to file a "Speedy Trial" motion.

        In sum, the Court concludes, that petitioner has failed to satisfy the two-part test outlined in Hill, supra. Petitioner has failed to demonstrate that defense counsel's performance was not within the range of competence expected of criminal defense attorneys. See, Hill, 474 U.S. at 56-59. In fact, petitioner's contentions regarding inadequacy of counsel are refuted by his own testimony during the plea colloquy. In response to questioning by the court, Brown stated that he was satisfied with counsel's advice. Tr. at 12. Further, petitioner has failed to demonstrate that, but for counsel's errors, there is a reasonable probability

---

3.  Counsel did inquire into the conditions of petitioner's cell at the time petitioner confessed. See Transcript, Suppression Hearing ("Tr. Supp."), December 1, 1988, at 25-26, 28, 35.

4.  Counsel did inquire into alleged inconsistencies in petitioner's statement. See Tr. Supp., December 1, 1988, at 45, 46, 48.

5.  See Tr. at 10 (petitioner stated to the Court that no one was coercing him into entering a guilty plea).

6.  See Tr. at 4-6.

that he would not have pleaded guilty and would have insisted on going to trial. Id. In fact, petitioner fails to make even a conclusory statement to the effect that he would have chosen to proceed to trial, but for counsel's errors.

C. **Petitioner's Remaining Contentions**

Petitioner's remaining contentions include the following: (1) lack of probable cause for arrest and search warrants; (2) Grand Jury Indictment allegedly based on false information; (3) falsification of evidence by the police; (4) lack of evidence connecting petitioner to the offense; (5) allegedly involuntary confession; and (6) denial of lower court transcripts.

As stated above, in Tollett the Supreme Court stated that because a guilty plea represents a break in the chain of events which has preceded it, a defendant who has under oath admitted that he committed the offense with which he is charged, "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." 411 U.S. at 267. Defendant's only recourse is to attack the voluntary and intelligent character of the plea, by showing that defense counsel's advice was not within the range of competence expected of criminal defense attorneys. Id.

Notwithstanding petitioner's guilty plea and its impact on independent claims relating to the deprivation of constitutional rights, specifically with regard to the denial of transcripts, the Court first finds that petitioner was given adequate information on how to obtain the transcripts free of charge, and that upon receipt

of that information, petitioner neglected to request the transcripts in a timely manner.[7]  The Court thus concludes that petitioner has failed to demonstrate any prejudice on this issue, even assuming that petitioner's contention rises to a constitutional violation.

## V. CONCLUSION

For the foregoing reasons, petitioner James G. Brown's habeas petition is DENIED.  An appropriate order will be entered.

---

7.  See Letter dated 5/3/89 to Brown from Delaware Superior Court Chief Court Reporter (directing petitioner that his request for transcripts must be directed to the Criminal Office Judge); Letter dated 5/12/89 to Brown from Clerk of the Delaware Supreme Court (instructing petitioner that his request must be directed to the Criminal Office Judge); Letter dated 7/10/89 to Brown from the Clerk of the Delaware Supreme Court (informing Brown that any difficulty in obtaining the transcripts cannot delay the progress of his appeal, and further informing Brown that the Delaware Supreme Court will entertain timely written requests for an extension of the briefing schedule).
        Petitioner's letter to the Criminal Office Judge requesting the transcripts is dated September 25, 1989.  On September 27, 1989, the Delaware Supreme Court affirmed the April 25, 1989 Order of the Delaware Superior Court, denying. petitioner's motion to withdraw his guilty plea.

19





## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### ELBERT N. CARVEL STATE OFFICE BUILDING
### 820 NORTH FRENCH STREET, FIFTH FLOOR
### P. O. BOX 8911
### WILMINGTON, DELAWARE 19801
### PHONE 571-3230

**LAWRENCE M. SULLIVAN**
DEFENDER

**DOVER OFFICE**
**ASSISTANT DEFENDERS**
DUANE D. WERB
ROBERT P. LOBUE
THOMAS D. H. BARNETT
JOSEPH A. GABAY
101 COURT STREET
DOVER, DE 19901

**GEORGETOWN OFFICE**
**ASSISTANT DEFENDERS**
KARL HALLER
HOWARD W. HUDSON, JR.
STEPHEN CALLAWAY
S. BEDFORD & PINE STS.
GEORGETOWN, DE 19947

**CHIEF DEPUTY**
ANGELO FALASCA

**ASSISTANT DEFENDERS**
JOHN F. HYDE
RICHARD M. BAUMEISTER
JOSEPH B. GREEN
HAROLD N. GREEN
DAVID M. LUKOFF
HOWARD F. HILLIS
GREGG E. WILSON
JAMES R. LALLY
EDWARD C. PANKOWSKI, JR.
EDWARD F. EATON
J. DALLAS WINSLOW, JR.
RUTH L. MATRUDER
JAMES A. BAYARD, JR.
RAYMOND J. OTLOWSKI
RAYMOND J. HANCOCK
PETER N. LETANG
DAVID J. FACCIOLO
EDMUND M. HILLIS
BRIAN J. BARTLEY
NANCY JANE MULLEN
PATRICIA C. HANNIGAN
JOHN H. McDONALD
TIMOTHY N. COLLINS
R. STOKES NOLTE

September 16, 1985

Mr. Charles Duffy
Sussex Correctional Inst.
Georgetown, Del. 19947

Dear Charles:

This will confirm what happened on 9/13/85 before Judge Tease with Prosecutor Sandy present.   At that time you were sentenced on rape in the first degree.

Prior to sentencing I reviewed my pre-sentence remarks with you.

Prosecutor Sandy said he "prayed" that you would never released.  This seemed to me to be extreme behavior, to say the least.

Judge Tease sentenced you to life defined as 45 years imprisonment.  Twenty years of this is mandatory.

I asked  Judge Tease to make remarks concerning advisability of your transfer to Pennsylvania but he declined to do so.  I did so on your behalf.

Also, I got the prosecutor to state in the record that he no objection to your going to Pennsylvania.

I hope that the transfer can be worked out so that you can receive therapy from Dr. Canals.

Yours truly,



Karl Haller, Esq.

*EXHIBIT F.*

*Return to Client.*

SUPERIOR COURT
OF THE
STATE OF DELAWARE

NORMAN A. BARRON
JUDGE

COURT HOUSE
WILMINGTON, DE. 19801-3353

August 3, 1994

Mr. Luther L. Jones
Delaware Correctional Center
Smyrna Landing Road
Smyrna, DE 19977

RE:    *State v. Luther L. Jones*
        Cr.A. No. 1343, 1970

Dear Mr. Jones:

The Court is in receipt of your letter which was filed with the Prothonotary on August 10, 1994. In your letter, you raise questions about your eligibility for earned good time and early release. As best as the Court can discern, you pleaded guilty to Murder in the second degree on July 29, 1971. On September 24, 1971, you were sentenced to a term of imprisonment for the rest of your natural life commencing on June 10, 1970. Thus, you have already served more than 24 years on this sentence.

I can tell you that at the time you entered your plea, the statute in question read as follows:

§ 572.  *Murder in the second degree.*

Whoever commits the crime of murder other than murder in the first degree, is guilty of murder in the second degree and of a felony, and shall be imprisoned for life, and may be fined in such amount as the court, in its discretion, may determine.

What is noteworthy, in the Court's view, is that under the old Criminal Code, offenses were not denominated by degree, such as class A or class B. Murder in the second degree was merely denominated as "a felony."

On July 17, 1989, the Governor signed into law 67 *Del.Laws*, c. 130, to take effect with respect to *all crimes committed as of 12:01 a.m., June 30, 1990, or thereafter.* (Emphasis added.) One part of this new law which is known as the Truth in Sentencing Act of 1989, is 11 *Del.C.* § 4381, which at subsection (a) states:

*EXHIBIT G.*

*State v. Luther L. Jones*
Cr.A. No. 1343, 1970
August 31, 1994
Page 2

> (a)    All sentences imposed for any offense *other than a life sentence imposed for class A felonies* may be reduced by earned good time under the provisions of this section and rules and regulations adopted by the Commissioner of Corrections. (Emphasis added.)

Although other statutes may well be involved, based on the two cited above,[1] I would conclude that you are probably eligible for earned good time credits. But, before you do anything, I would advise you getting together with William Killen, Legal Manager, Public Defender's Office. Show him my letter and ask him to do further research for you. I am sure he would be happy to assist you.

I trust this is helpful. I regret it cannot be more definitive.

Very truly yours,

NAB:pn
xc: Mr. William Killen
     Prothonotary
     File (JONES)

---

[1]Another statute under the old Criminal Code, 11 *Del.C.* § 4346(a), states in pertinent part, that "A person confined . . . may be released on parole by the Board if he has served 1/3 of the term imposed by the Court. . . ." Another statute, 11 *Del.C.* § 4346(c), states, in pertinent part, that a "person sentenced to imprisonment for life shall be considered as having been sentenced to a fixed term of 45 years." As stated, it appears that you have already served more than 50% of your sentence.

EXHIBIT G.

✓ #/2.



**SUPREME COURT OF DELAWARE**

April 11, 2005

**MYRON T. STEELE**
*CHIEF JUSTICE*

**SUPREME COURT BUILDING**
**57 THE GREEN**
**DOVER, DELAWARE 19901**

**TELEPHONE: (302) 739-4214**
email: myron.steele@state.de.us

Governor Ruth Ann Minner
Tatnall Building
William Penn Street
Dover, DE   19901        # 47, 2005

Dear Governor Minner:

Enclosed is a copy of the decision in *Evans v. State*, No. 67, 2004, that was released today. This decision holds that House Bill No. 31 is entirely unconstitutional. This decision makes your request for an opinion from the Justices moot. As you know, 11 Del.C. § 141(d) provides for you to notify the General Assembly of our response.

Sincerely,

Mccccccccc

enclosure
c:      Chief Justice Myron T. Steele
        Justice Carolyn Berger
        Justice Jack B. Jacobs
        Gregory E. Smith, Esquire
        Kim Ayvazian, Esquire
        Thomas J. Allingham, II, Esquire
        James Brendan O'Neill, Esquire
        Bernard J. O'Donnell, Esquire
        James D. Nutter, Esquire

*EXHIBIT H.*





STATE OF DELAWARE
DEPARTMENT OF CORRECTION
80 MONROVIA AVENUE
SMYRNA, DELAWARE 19977

OFFICE OF THE
COMMISSIONER

TELEPHONE: (302) 739-5601
FAX: (302) 739-8740

June 24, 1994

Earl M. Folks
Delaware Correctional Center
Smyrna, DE  19977

Dear Mr. Folks:

Governor Carper referred your letter of May 7, 1994 to me for a response.

You are correct that SB 294 requires an inmate convicted of a violent felony to serve at least fifty percent of his or her sentence before being eligible for sentence modification. However, neither this bill nor the Truth-in-Sentencing law applies to sentences imposed prior to their enactment. In your particular case, since you were sentenced in 1983, neither SB 294 nor Truth-in-Sentencing apply to you.

I had your good time credits reviewed by Delaware Correctional Center staff. Your record shows that you have usually received the maximum five days per month good time allowed for persons sentenced under the pre-Truth-in-Sentencing law or "old" law.

I trust this adequately answers your questions.

Sincerely,

Robert J. Watson
Commissioner

RJW/CWF/js

xc: Jill Morrison
        Governor's Office

EXHIBIT I.



50 cents

aware  State News

The Downstate Daily

...day, September 18, 2006

EXHIBIT J.

# Evans to appeal term again

### Prisoner trying another objection to life sentence

**By Drew Volturo**
Delaware State News

DOVER — When Department of Correction inmate Ward T. Evans successfully argued to the Delaware Supreme Court in late 2004 that his life sentence actually was a 45-year term, the decision sent shock waves of fear and out-rage throughout the state.

Then-Attorney General M. Jane Brady said nearly 200 inmates serving life sentences for murder, rape and kidnapping would be eligible for release.

The General Assembly, in an unusual show of efficiency early in its 2005 session, hurriedly and unanimously passed a bill declaring the high court's November 2004 ruling "null and void."

Gov. Ruth Ann Minner quickly signed the bill into law amid questions about its constitutionality and objections from the legal community.

In April 2005, the Supreme Court reconsidered its decision on appeal and withdrew its original opinion, upholding the Superior Court's original decision that a life sentence was not defined as 45 years.

But the claim that has existed



**Ward T. Evans**

for the past 17 months is being stirred by another appeal to the state Supreme Court by Evans, who said he has found more examples that support his argument.

"I have found case(s) where judges, prosecutors and public defenders had always interpreted the relevant statutes as I had," Evans wrote in an Aug. 31 letter to the Delaware State News.

"In some cases, judges and prosecutors used it as a plea bargain tool. They would tell the defendant they were actually get-

ting 45 years."

Attorney General Carl C. Danberg was out of the country and unable to comment for this article last week, agency spokeswoman Janice Fitzsimons said.

Chief Deputy Attorney General Malcolm S. Cobin, through Ms. Fitzsimons, declined to comment on the case, referring all questions to the state's Aug. 18 answering brief before the Supreme Court.

The high court has received all

See Evans — Page 9

---

## Dover faces fine mess

### City searches for ways to fund

At a council meeting last week, staff estimated that it would cost $70,000 to clean

---

**Downstate celebration: Sweet fleet**



# Evans

Continued From Page 1

briefings from both parties and is expected to consider the matter later this month.

Although he wasn't aware of the pending matter before the court, House Majority Leader Rep. Wayne A. Smith, R-Wilmington, is not worried about a repeat of the November 2004 decision.

"I'm confident the court will keep dangerous murderers and rapists off the streets," said Rep. Smith, who was the lead sponsor of the 2005 bill to nullify the Supreme Court's ruling.

"There was a finality to it when the Supreme Court reached its April (2005) ruling."

## Decision reconsidered

Evans was convicted Sept. 29, 1982, of first-degree rape of a 14-year-old girl and sentenced to life in prison with the possibility of parole.

Evans has maintained his innocence throughout the years.

Although Evans was denied parole three times between 1993-99, he filed a motion with Kent County Superior Court in January 2004, claiming his sentence was illegal.

Evans argued that according to the Delaware Code, he is entitled to a conditional release date calculated as if his life sentence were 45 years instead of a "natural" life in prison.

Superior Court denied Evans' motion, so he took his appeal to the Supreme Court.

The high court accepted Evans' arguments and overturned the Superior Court ruling.

The justices cited a 2003 case — Crosby vs. State — defining life sentences for Class A felonies as 45 years, before Truth in Sentencing began in 1990.

Although the court initially refused the attorney general's request to re-argue the Evans case, the court agreed in February 2005 to "reconsider" its ruling after the Department of Justice filed papers claiming the court misinterpreted the "legislative intent" of the law.

In its April 2005 opinion, the Supreme Court found that Evans' life sentence was controlled by a different court case — Jackson vs. State.

"In Jackson' ... (we) held that an inmate who is serving a life sentence with the possibility of parole is not entitled to conditional release under section 4348," the opinion states.

"We stated that if the General Assembly had intended to permit those inmates serving life sentences with the possibility of parole to be eligible for conditional release under section 4348, it would have expressly so stated in the statute.

"We hold that Evans — like Jackson — is not eligible for conditional release and must remain incarcerated until his death, unless he is granted parole."

## Four more examples

Evans, still housed at Delaware Correctional Center near Smyrna, has continued his research and efforts to support his contention.

Superior Court President Judge James T. Vaughn denied Evans' October 2005 motion for a modification of sentence in April.

In May, Evans filed a four-page motion to recall mandate to the

### What do you think?

Do you have an opinion on this issue? Share your comments.

● Public forums
http://www.newszapforums.com

● 24-hour Sound Off line
678-8255 (Kent County)
629-2050 (Sussex County)

● E-mail: soundoff@newszap.com

Supreme Court citing two Superior Court cases that he said backs up the 45-year claim.

During a March 1989 sentencing of James G. Brown, who had pleaded guilty to first-degree sexual intercourse, the judge said life was 45 years, Evans said in his filing.

During jury deliberations in the 1974 Superior Court case Smith vs. State, the jury asked the judge, "In terms of years, how many years is a life sentence?"

The judge, Evans wrote, replied that it was a fixed term of 45 years.

"The courts of Delaware in 1974 and 1989 had indeed interpreted a parolable life sentence as a fixed sentence of 45 years with a right of a defendant to earn statutory and merit good time with a max-out date and a right to conditional release," Evans wrote.

"Rulings made by a trial court and not challenged on appeal become the law."

The Supreme Court denied the state's May motion to dismiss Evans' appeal in July, with Justice Carolyn Berger writing, "Evans' appeal should be considered on its merits."

In the state's 20-page answering brief, chief of appeals Loren C. Meyers wrote that Evans could

only be released from prison by the Board of Parole.

"Evans makes much of the fact that in neither of his two examples did the State appeal the particular Superior Court decisions," Mr. Meyers wrote.

"It is, however, not exactly clear how the State could have done so under the statutes that provide the State with a right to appeal.

"In addition, the government, in order to avoid any estoppel effect, is not required 'to appeal every adverse decision.' ... As a result, no inference can be drawn from the absence of any appeal by the state in the two cases to which Evans refers."

In Evans' Aug. 25 reply brief, the inmate cited two more instances that mentioned 45 years as a life sentence — a 1985 letter from a public defender to an inmate and a 1987 Superior Court sentencing order.

Rep. Smith said Evans is entitled to avail himself of the court system, and is not surprised by the ongoing proceedings.

"When you have a prisoner with unlimited access to a law library, you tend to get these suits regularly," Rep. Smith said.

But Evans' short-lived 2004 Supreme Court victory sent legislators scrambling to counteract it, passing a law that later was found to be unconstitutional.

Rep. Smith declined to comment whether there could be future General Assembly action if Evans' sentence is modified to 45 years.

Post your opinions in the Public Issues Forum at newszap.com
Staff writer Drew Volturo can be reached at 741-8296 or dvolturo@newszap.com

EXHIBIT J.

# Certificate of Service

I, SYLVESTER SHOCKLEY ,hereby certify that I have served a true

And correct cop(ies) of the attached: PETITIONER'S TRAVERSE TO RESPONDENTS

ANSWER/EVIDENTIARY HEARING REQUESTED upon the following

parties/person (s):

TO: THE CLERK OF THE UNITED STATES          TO: _____

DISTRICT COURT FOR DELAWARE                 _____

844 KING STREET, LOCKBOX 18                 _____

WILMINGTON, DELAWARE 19801                  _____

                                        _____

TO: LOREN C. MEYERS                         TO: _____

CHIEF OF APPEALS DIVISION                   _____

DEPARTMENT OF JUSTICE                       _____

820 N. FRENCH STREET                        _____

WILMINGTON, DELAWARE 19801                  _____

**BY PLACING SAME IN A SEALED ENVELOPE, and depositing same in the United
States Mail at the Delaware Correctional Center, Smyrna, DE 19977.**

On this 6th day of OCTOBER ,2006

Sylvester Shockley

IM 

SBI# 006135 UNIT W

DELAWARE CORRECTIONAL CENTER

1181 PADDOCK ROAD

SMYRNA, DELAWARE 19977

Clerk of the U.S. Dist. Court

844 King St.

Lockbox 18

Wilmington, DE

19801